**UNITED STATES, Appellee**

v.

**Craig A. COBB, Yeoman Seaman Apprentice, U.S. Navy, Appellant.**

No. 95–0810.
Crim. App. No. 94–1210.

U.S. Court of Appeals for the Armed Forces.

Argued March 25, 1996.

Decided Sept. 18, 1996.

For Appellant: *Major R.K. Stutzel, USMC* (argued); *Lieutenant C.J. McEntee, JAGC, USNR.*

For Appellee: *Lieutenant Andrew J. Waghorn, JAGC, USNR* (argued); *Colonel Charles Wm. Dorman, USMC,* and *Commander D.H. Myers, JAGC, USN* (on brief).

*Opinion of the Court*

SULLIVAN, Judge:

Appellant was tried by a general court-martial composed of a military judge sitting

alone at Yokosuka, Japan, during February and March 1994. Contrary to his pleas, he was found guilty of conspiring with two other sailors to commit robbery and participating in the actual commission of that robbery, in violation of Articles 81 and 122, Uniform Code of Military Justice, 10 USC §§ 881 and 922, respectively. He was sentenced to a bad-conduct discharge, confinement for 8 months, total forfeitures for 8 months, and reduction to pay grade E–1. The convening authority approved the sentence as adjudged on August 5, 1994. The court below in an unpublished opinion affirmed on March 24, 1995.

On September 8, 1995, this Court granted review of the following issues:

## I

WHETHER THE LOWER COURT ERRED AS A MATTER OF LAW WHEN IT DETERMINED THAT APPELLANT WAS MORE THAN AN UNINVOLVED BYSTANDER DURING THE CONSPIRACY AND ROBBERY.

## II

WHETHER THE LOWER COURT ERRED AS A MATTER OF LAW WHEN IT DETERMINED THAT ADMISSION OF AN OPINION OF A NAVAL CRIMINAL INVESTIGATIVE SERVICE SPECIAL AGENT REGARDING THE TRUTHFULNESS OF PORTIONS OF APPELLANT'S SWORN STATEMENT WAS HARMLESS ERROR.

We hold that the evidence is legally sufficient to sustain appellant's conviction for conspiracy to commit robbery and robbery. *See generally Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Harper*, 22 MJ 157, 161 (CMA 1986). We also hold that the investigator's comment on appellant's truthfulness was error, but that such error was harmless under the circumstances of this case. Art. 59(a), UCMJ, 10 USC § 859(a); *see United States v. Cacy*, 43 MJ 214, 218 (1995).

The Court of Criminal Appeals summarized the evidence of record in this case as follows:

Both offenses stem from a drive-by purse snatching that occurred in Tokyo, Japan, where the appellant and his two shipmates, Postal Clerk Third Class Lindsey and Yeoman Seaman Vaghar, were serving. The basic facts are not in dispute: Vaghar was driving a small automobile that belonged to him, Lindsey was riding in the car in the front seat and actually grabbed the victim's purse as he leaned out of the car window, and the appellant was riding in the back seat.

The appellant did not testify at trial but said in a sworn statement that he was half asleep and half awake when the robbery occurred. He claimed that "he never discussed doing anything like this before," and that "he did not know ... [the other two] were going to take a woman's purse until they actually did it," that he "in no way ... plan[ned] to take a woman's purse that evening," that he "just heard them [the other two] talking about doing it," and that he "never said anything pertaining to their plans." He admitted, however, that after he overheard the discussion of how the robbery was to be carried out, they drove around for 10 to 20 minutes looking for a woman with a purse until they spotted a woman walking down an alley, and the next thing he knew, the woman screamed and Lindsey had a purse. Now apparently fully alert, the appellant admits he said "Now I can fix my car" when he saw the large amount of money in the purse because he expected to be given some of the fruits of the endeavor. (Prosecution Ex. 1 at 2). Evidence was offered by the defense that the appellant in fact suffers from a medically diagnosed sleep disorder and his work supervisor in the administrative department where the appellant was assigned testified that he suspected the existence of such a problem even before it was diagnosed because he had observed the appellant asleep on the job, sometimes with fingers poised on computer keys, as much as 20 times a day.

Lindsey [a coconspirator] testified as a prosecution witness under a grant of immunity after he had been convicted of the theft by the Japanese Government. Despite the grant of immunity and his earlier conviction, he was not a cooperative witness. Lindsey testified that he had only met Vaghar the day before the robbery when the appellant introduced him and that the appellant had described Vaghar's method of stealing money from the purses of Japanese women to him before the evening in question. He said that the appellant asked him if he wanted to join the appellant and Vaghar on a trip off-base that evening and he agreed. He also said that in the course of the evening he noticed there were a large number of people on the streets where they were and that he made the comment that there were "a lot of purses." He testified that Vaghar at one point said that he was broke and needed "to be paid," which Lindsey understood to mean taking money from a woman's purse.

After they had spotted their intended victim, Lindsey testified that Vaghar kept urging him on by repeatedly telling him, you're "going to get it." Although Lindsey said the appellant was sort of slouched in the back seat during some of this time and appeared to be sleeping, he also said that both he and the appellant said "let's go home" after the victim had been spotted and when Vaghar was urging him to get the purse. Despite this expression of reservation about the criminal enterprise, the robbery immediately took place. Lindsey also expressly denied there was any plan or scheme to commit the robbery, claiming it was just a spontaneous act, and denied that he had taken part in any discussion about grabbing a purse but he admitted that such a conversation had occurred. The obvious implication [was] that the conversation was between the appellant and Vaghar.

In addition, Lindsey testified that while he was leaning out of the car window to grab the purse, someone in the car was holding him so he wouldn't fall out of the car. Although he couldn't see which one of the other two occupants of the car it was, from his account of how he was positioned in the window it is apparent the assistance was coming from the general location of the appellant, not the driver. It is possible that Vaghar could have driven the car and still tried to assist Lindsey, but from Lindsey's account it is much more likely that the unseen assistant was the appellant. This alone might have been insufficient to convince the trier of fact that the appellant was a knowing and willing participant, but when it is added to the other evidence concerning the discussions of what was intended, the time spent driving around looking for a likely victim, the appellant's own expectation of sharing in the illegal gain convinces us that the appellant was not sleeping while the robbery was carried out.

Unpub. op. at 2–3.

— — —

I

█ The first issue in this case is whether the evidence of record is legally sufficient to uphold appellant's convictions for conspiracy to commit robbery and robbery. The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 MJ 324 (CMA 1987), citing *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789. By applying this standard of review, appellate courts acknowledge "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weight the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Hart*, 25 MJ 143, 146 (CMA 1987), quoting *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct at 2788.

█ We first turn to the legal sufficiency of the evidence to support appellant's conspiracy conviction. It is well-settled that "[t]he existence of a conspiracy 'need not take any "particular form or be manifested in any formal words." ' " *United States v. Barnes*, 38 MJ 72, 75 (CMA 1993). Moreover, "[t]he agreement ... can be silent" or

merely a "mutual understanding among the parties." *Id.* at 75 (citations omitted). Indeed "the existence of a conspiracy is generally established by circumstantial evidence and is usually manifested by the conduct of the parties themselves." *Id.* Furthermore "[t]he agreement need not be expressed but need only be implied to sustain a finding of guilty." *United States v. Matias,* 25 MJ 356, 362 (CMA 1987).

In appellant's case, we note there was direct evidence that Vaghar and Lindsey on the night in question agreed to steal a Japanese woman's purse for money. Appellant's own pretrial statement established that he overheard these two sailors talking about committing such a crime and planning to use Vaghar's car to accomplish it. Appellant's agreement to join this criminal venture, however, was shown less subtly by circumstantial evidence.

In his pretrial statement, he admitted that he expected to share in the proceeds of the robbery and told his companions as much when they examined the woman's purse. Lindsey further testified that, prior to the robbery, appellant informed him of Vaghar's practice of purse stealing from Japanese women; invited him to travel to the robbery site with appellant and Vaghar; and effectively informed him that Vaghar was going to rob a Japanese woman of her purse that night.

This evidence tended to show that appellant had "a common purpose" with his fellow sailors on the night in question: *i.e.,* to acquire money. *See United States v. Barnes,* 38 MJ at 75. It also tended to show that he associated with them that night, knowing of their criminal venture and expecting that it would solve his financial problems. *See United States v. Matias,* 25 MJ at 362. Finally, his conduct in bringing together his fellow sailors who were criminally inclined and arranging their joint transportation to the robbery scene was evidence of his participation in this conspiracy. *See United States v. Jackson,* 20 MJ 68, 69 (CMA 1985). In our view, this was sufficient evidence from which a reasonable factfinder could find beyond a reasonable doubt that appellant con-

spired with Vaghar and Lindsey to commit the charged robbery.

■ We reach the same conclusion concerning appellant's robbery conviction. Appellant correctly points out that he was found guilty of the robbery actually committed by Lindsey, on the legal theory of aiding and abetting. *See* Art. 77, UCMJ, 10 USC § 877. To prove this theory we have said:

> All that is necessary is to show some affirmative participation which at least encourages the principal to commit the offense in all its elements as defined by the statute. Actual participation in the substantive crime is not required so long as the elements of aiding and abetting are established.

*United States v. Pritchett* 31 MJ 213, 216–17 (CMA 1990), quoting *United States v. Knudson,* 14 MJ 13, 15 (CMA 1982).

Moreover, we have held that, while mere presence at the crime cannot alone sustain a conviction, "presence at the scene is a circumstance which may be considered by the factfinder in determining whether a person aided and abetted another in the commission of a crime." *Pritchett, supra* at 217. Finally, this Court will "examine the record for other evidence of appellant's purposeful association with [the] crimes and some act of participation, assistance, or encouragement of each crime by him." *Id.*

In this case, we note that there was ample circumstantial evidence that appellant aided and abetted Lindsey and Vaghar in robbing the Japanese woman. He was not only shown to have been present in the car used to accomplish the purse snatching; but also he was shown to be fully aware of his companions' impending crime and its *modus operandi. United States v. Speer,* 40 MJ 230, 234 (CMA 1994). Moreover, it was clearly shown that appellant expected and in fact was offered an opportunity to share in at least a minimal portion of the robbery proceeds. *See United States v. Pritchett, supra* at 216–17. Finally, there also was evidence upon which the members could rationally conclude that appellant physically supported Lindsey in his bold extension from the car window to grab the Japanese woman's purse.

*See United States v. Burroughs,* 12 MJ 380, 383 (CMA 1982). This evidence, coupled with the earlier noted evidence of appellant's efforts in forming this robbery team, clearly demonstrated his purposeful association and participation, assistance, and encouragement of his fellow sailors' crime.

## II

■ The second issue in this case asks whether the court below erred when it found that appellant was not prejudiced by erroneous admission of government evidence attacking his credibility. *See generally Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) (nonconstitutional error harmless unless has substantial impact on outcome of case); *United States v. Marrie,* 43 MJ 35, 42 (1995) (credibility comment harmless error due to strength of Government's case); *cf. United States v. Cameron,* 21 MJ 59, 66 (CMA 1985) (even though trial before military judge alone, credibility comment not harmless error due to weakness of government case). At particular issue in this case is the prejudicial impact of a naval investigator's testimony which commented on appellant's apparent lack of truthfulness in his pretrial statements.

The objectionable testimony is contained in the record as follows:

Q [TC] Let me ask you another question about his demeanor. Did he seem truthful throughout the interview?

A Are you asking my opinion?

Q Yes.

A No, I didn't think he was—

DC Objection. Opinion as to truth.

MJ What's the legal reason for excluding that?

DC She's not in the position to make that kind of an opinion, sir.

MJ The prosecution has not laid a sufficient foundation to show her ability to tell whether or not someone is being truthful?

DC Yes, sir.

* * *

Q In evaluating him, did you have an opinion as to whether or not he was being truthful with you?

A *My opinion was, he was not being entirely truthful.*

Q What gave you an indication that he was not being truthful?

A Part of his statement that he asked to be included, the fact that he had said he was half asleep, but he did expect to get the money; and, he had no knowledge of it but he expected to get money, after the fact, after they stole her purse. It didn't make sense together, if you were asleep how would you know the money was coming your way?

(Emphasis added.)

The appellate court below held that the military judge erred in allowing the witness to comment on her view of appellant's credibility, but concluded that appellant was not prejudiced by the error. That court said:

Not only was the trial before a military judge, vice members, but the inconsistencies and contradictions in the appellant's statement that the witness identified as the basis for her conclusion were obvious and would have raised questions concerning the credibility of the appellant's statement even in the absence of the witness' opinion. Consequently we find no prejudice to the appellant as the result of this error.

Unpub. op. at 5. We agree.

This Court has generally held that, "[w]hile admission of expert testimony relating to believability of a witness' testimony or statement can, in some instances, result in prejudicial error requiring corrective action, reversal is not required if the court's error can be determined to be harmless." *United States v. Cacy,* 43 MJ at 218 (citations omitted). Non-constitutional harmless error analysis assesses "what effect the error had or reasonably may be taken to have had upon the [factfinders'] decision." *Kotteakos v. United States,* 328 U.S. at 764, 66 S.Ct. at 1247. Moreover, the Supreme Court has said:

If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the

verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a very specific command of Congress.

*Id.* at 764–65, 66 S.Ct. at 1248 (footnote omitted).

Turning to the present case, we agree with the appellate court below that appellant was not substantially prejudiced by the investigator's inadmissible testimony on appellant's veracity. *See United States v. Garcia,* 44 MJ 27 (1996). This was a trial by judge alone, and we presume that the prejudicial impact of erroneously admitted evidence on a judge would be substantially less than on untrained members. *See United States v. Cacy, supra* at 218. Moreover, appellant's truthfulness problems were readily apparent, even to a layman, from the face of his inconsistent pretrial statements. (Why did he expect to share the proceeds of the robbery if he slept through its commission and had no role in its planning?) The challenged evidence, in a very real sense, was cumulative of the documentary evidence properly admitted in this case. *See United States v. Davis,* 44 MJ 13, 17 (1996); *see also United States v. McElroy,* 40 MJ 368, 371 (CMA 1994). Finally, our review of the record in this case reveals that the critical evidence *against* appellant was Petty Officer Lindsey's testimony, not appellant's mostly exculpatory pretrial statement. *See United States v. King,* 35 MJ 337, 342 (CMA 1992). In this context, we find no reversible error under Article 59(a). *See* Mil.R.Evid. 103(a), Manual for Courts–Martial, United States, 1984.

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges CRAWFORD, GIERKE, and WILKINS * concur.

---

* Judge William W. Wilkins, Jr., of the United States Court of Appeals for the Fourth Circuit, sitting by designation pursuant to Article 142(f), Uniform Code of Military Justice, 10 USC § 942(f).